UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WHITESELL CORPORATION,

  Plaintiff,

v.

                Case No. 1:05-CV-679

WHIRLPOOL CORPORATION,
WHIRLPOOL MEXICO S.A. de C.V.,      HON. ROBERT HOLMES BELL
and JOSEPH SHARKEY,

  Defendants,

and

WHIRLPOOL CORPORATION,

  Counter-Plaintiff,

v.

WHITESELL CORPORATION,

  Counter-Defendant.
                /

## **OPINION**

  This matter comes before the Court on Defendant and Counter-Plaintiff Whirlpool's motion for partial summary judgment on Plaintiff and Counter-Defendant Whitesell's: (1) claims arising under the parties' 1995 strategic alliance agreement; (2) request for rescission of the parties' mutual release; and (3) claim for fraud. (Dkt. No. 423.) On February 19, 2009, the parties agreed to a stipulation and order dismissing: (1) Plaintiff's claims arising under

the parties' 1995 strategic alliance agreement; and (2) Plaintiff's request for rescission of the parties' mutual release. (Dkt. No. 461.) Thus, Defendant's original motion for partial summary judgment has been reduced to a motion for partial summary judgment exclusively on Plaintiff's claim for fraud. For the reasons that follow, Defendant's motion will be granted.

**I. Factual Background**

On March 15, 2002, the parties jointly executed a "Strategic Alliance Agreement" ("2002 SAA"). The 2002 SAA required Defendant to purchase all of Defendant's requirements for certain categories of "fasteners" (screws, nails, nuts, bolts, etc.) from Plaintiff over the term of the 2002 SAA.

The 2002 SAA contained a choice-of-law provision providing that "[t]his Agreement shall be governed in all respects, including validity, interpretation and effect, by and construed in accordance with the internal laws of the State of Michigan." (2002 SAA § 16.8.) The 2002 SAA contained a merger clause providing that "the parties acknowledge and agree that . . . there are no oral agreements or understanding [sic] between them affecting the subject matter of this Agreement." (2002 SAA § 16.2.) The 2002 SAA also contained a no-reliance clause providing that:

> Each party acknowledges that it has had full opportunity to consult with such legal and financial advisors as it has deemed necessary or advisable in connection with its decision knowingly to enter into this Agreement. Neither party has executed this Agreement in reliance on any representations, warranties, or statements made by the other party hereto other than those expressly set forth herein.

2

(2002 SAA § 16.10.)

According to Plaintiff, and not currently disputed by Defendant, Defendant made five allegedly fraudulent representations to Plaintiff prior to or contemporaneous with the execution of the 2002 SAA:[1] (1) that Defendant could not purchase the cold-headed and threaded fasteners listed on Exhibit B-2 from Plaintiff because Defendant was already contractually obligated to purchase those parts from other suppliers (Dkt. No. 444, Pl.'s Resp. 2, 7-8); (2) that Defendant would provide Plaintiff with a minimum of $5-6 million of new business in addition to the obligations under the contract each year (*Id.* at 2, 7); (3) that Defendant intended to transfer $75 million in revenue to Plaintiff by virtue of the 2002 SAA (Dkt. No. 14, Am. Compl. ¶ 122; Dkt. No. 444, Pl.'s Resp. 7); (4) that Defendant intended to use Plaintiff as its primary supplier of fasteners through 2007 (Dkt. No. 14, Am. Compl. ¶ 122; Dkt. No. 444, Pl.'s Resp. 7); and (5) that Defendant intended to work in good faith with Plaintiff during the course of the 2002 SAA (Dkt. No. 14, Am. Compl. ¶ 122). Defendant has moved for summary judgment on Plaintiff's fraud claims brought pursuant to all five of these alleged misrepresentations.

---

[1] Plaintiff's complaint asserts one catch-all claim for fraud. (Dkt. No. 14, Am. Compl. ¶¶ 118-136.) However, Plaintiff identifies five allegedly fraudulent misstatements. Therefore, the Court will treat and refer to Plaintiff's claim for fraud collectively as Plaintiff's claims for fraud.

## II. Law and Analysis

1. Applicable Law

A federal district court sitting in diversity applies the substantive law, including the choice-of-law rules, of the state in which it sits. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 79 (1938). If, however, a case is transferred from one federal district court to another pursuant to 28 U.S.C. § 1404(a), the transferee court applies the law of the state in which the transferor state sits. *Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964). The case at hand was transferred to this Court from the United States District Court for the Northern District of Alabama pursuant to § 1404(a). (Dkt. No. 48, Op. & Order 11-12.) Thus, this Court must apply the substantive law of the state of Alabama, including the choice-of-law rules of that state.

Alabama choice-of-law rules allow parties to agree on the governing law by including a choice-of-law provision in a contract. *Lifestar Response of Ala., Inc. v. Admiral Ins. Co.*, No. 1060776, 2009 WL 280457, at *12 n.3 (Ala. Feb. 06, 2009). While a choice-of-law provision always governs contractual claims related to the contract, under Alabama law a choice-of-law provision only encompasses tort claims related to the contract, including fraud claims, if the choice-of-law provision is written broadly enough to encompass such claims. In *Williams v. Norwest Fin. Ala., Inc.*, 723 So. 2d 97 (Ala. Civ. App. 1998), the Alabama Court of Appeals held that a choice-of-law provision in an agreement providing that "[the agreement is] governed by the laws of Alabama" applied only to contractual disputes arising

4

out of the agreement and was not broad enough to encompass the plaintiff's claim for fraudulent misrepresentation. *Id.* at 101. There is little additional Alabama law addressing the adequacy of choice-of-law provisions to cover tort claims arising out of contractual agreements. State and federal courts alike, however, have found choice-of-law provisions to be broad enough to encompass tort claims when those provisions are written to cover, for example, "any claim or controversy of or relating to" the agreement, *Turtur v. Rothschild*, 26 F.3d 304, 309 (2d Cir. 1994), "all issues" concerning "enforcement of the rights and duties of the parties," *Capital Z v. Health Net, Inc.*, 43 A.D.3d 100, 103 (N.Y. 2007), or "all aspects of the legal relationship," *Jiffy Lube Int'l, Inc. v. Jiffy Lube of Pa., Inc.*, 848 F. Supp. 569, 576 (E.D. Pa. 1994).

The choice-of-law provision in the 2002 SAA is written broadly. It provides that the 2002 SAA "shall be governed in all respects, including validity, interpretation and effect" by the laws of Michigan. The term "in all respects" and the inclusion of questions surrounding the "validity" of the 2002 SAA suggest that this provision is closer in kind to those provisions held by most courts to cover fraud claims than to the provision in *Williams*. The Court holds that all of Plaintiff's claims, including Plaintiff's claims for fraud, are governed by Michigan law.

2. The Merger Clause

Under Michigan law, a merger clause (sometimes called an "integration clause") can preclude a fraud claim in two related ways. First, by establishing that a written contract is

an integrated agreement, a merger clause brings into play the parol evidence rule, which prohibits evidence of oral promises made prior to or contemporaneous with the execution of a written agreement. *UAW-GM Human Res. Ctr. v. KSL Recreation Corp.*, 579 N.W.2d 411, 414 (Mich. Ct. App. 1998). Second, since a merger clause nullifies a promise not included in the written agreement, it also makes reliance on that promise unreasonable. *UAW-GM*, 579 N.W.2d at 419; *Diamond Computer Sys. v. SBC Commc'n, Inc.*, 424 F. Supp. 2d 970, 985 (E.D. Mich. 2006). Reasonable reliance is one element of a fraud claim under Michigan law. *Novak v. Nationwide Mut. Ins. Co.*, 599 N.W.2d 546, 553 (Mich. Ct. App. 1999).

Even if a written agreement is integrated by virtue of a merger clause, however, parol evidence may be introduced to show that the agreement itself was procured by fraud. *Plate v. Detroit Fid. & Sur. Co.*, 201 N.W. 457, 458 (Mich. 1924). But to qualify for this exception to the parol evidence rule, the alleged misrepresentation must be so severe that it "invalidates the entire contract." *UAW-GM*, 579 N.W.2d at 509. Misrepresentations that relate to "discrete" terms of the contract are not sufficient to "invalidate[] the entire contract." *Diamond*, 424 F. Supp. 2d at 985. On the other hand, "representations of fact made by one party to another to induce that party to enter into a contract" are considered fraud that "invalidates the entire contract." *LIAC, Inc. v. Founders Ins. Co.*, 222 F. App'x 488, 493 (6th Cir. 2007) (quoting *Star Ins. Co. v. United Commercial Ins. Agency, Inc.*, 392 F. Supp. 2d 927, 928-29 (E.D. Mich. 2005)); *see also Custom Data Solutions v. Preferred Capital, Inc.*, 733 N.W.2d 102 (Mich. Ct. App. 2006). Since a merger clause makes reliance on

6

statements unreasonable because it makes evidence of those statements inadmissible under the parol evidence rule, it follows that when a statement is *not* inadmissible in light of a merger clause, reliance on that statement is also not unreasonable. *See Diamond*, 424 F. Supp. 2d at 984-85; *Custom Data*, 733 N.W.2d at 104-06.

Plaintiff does not dispute that the 2002 SAA was an integrated version of the parties' agreement. Plaintiff, however, argues that Defendant used fraudulent misrepresentations to induce Plaintiff into signing the agreement. (Dkt. No. 444, Pl.'s Resp. 21.) According to Plaintiff, these misrepresentations, if proven, constitute fraud that would invalidate the entire 2002 SAA because Plaintiff would not have entered into the contract had it known the truth. (*Id.*; Dkt. No. 440, Pl.'s Resp. 16 ("Plaintiff never would have entered into the 2002 SAA had it known the truth about the Exhibit B-2 list.").) All of the alleged misrepresentations, such as Defendant's representation that it intended to transfer $75 million in revenue to Plaintiff by virtue of the 2002 SAA, do not relate to any "discrete" terms of the agreement, but are substantial misrepresentations that could have induced Plaintiff to enter into the entire 2002 SAA. For this reason, Defendant's alleged misrepresentations "invalidate[] the entire contract." The merger clause does not bar evidence of these misrepresentation or make Plaintiff's reliance on these misrepresentations unreasonable.

3. The No-Reliance Clause

Like a merger clause, a no-reliance clause can abrogate the reliance element of a plaintiff's fraud claim. However, while a merger clause purports to make reliance on

7

statements unreasonable indirectly by first making them inadmissible under the parol evidence rule, a no-reliance clause directly and explicitly makes reliance on statements unreasonable. For this reason, no-reliance clauses have an altogether different effect than merger clauses on the reasonableness of reliance, and they therefore require a different analysis. *Deluxe Media Servs. v. Direct Disc Network, Inc.*, No. 06 C 1666, 2007 WL 707544, at *6-7 (N.D. Ill. Mar. 2, 2007) (holding that while merger clauses may not preclude fraud claims, no-reliance clauses may); *FMC Techs., Inc. v. Edwards*, No. C05-946C, 2007 WL 1725098, at *4 (W.D. Wash. June 12, 2007) ("It is undisputed that there is a significant difference between integration clauses and no-reliance clauses in contracts.").

Very few Michigan cases address the validity of no-reliance clauses.[2] A survey of persuasive authority reveals that courts generally look for three factors to determine if a no-reliance clause will successfully abrogate the reliance element of a fraud claim. First, courts are more willing to enforce a no-reliance clause if the provision disclaiming reliance is its own separate clause rather than a provision embedded within another clause of the agreement, such as a merger clause or an exculpatory clause. *See Vigortone AG Prod., Inc. v. PM AG Prods., Inc.*, 316 F.3d 641, 644 (7th Cir. 2002); *Rissman v. Rissman*, 213 F.3d 381, 385 (7th Cir. 2000); *Tirapelli v. Advanced Equities, Inc.*, 813 N.E.2d 1138, 1145 (Ill. App. Ct. 2004); *CFJ Assocs. of N. Y. Inc. v. Hanson Ind.*, 274 A.D.2d 892, 894 (N.Y. App. Div.

---

[2]The most relevant Michigan case is *Federated Capital Services v. Dextours, Inc.*, No. 228208, 2002 WL 868273 (Mich. Ct. App. Apr. 26, 2002), in which the Michigan Court of Appeals upheld a no-reliance provision to preclude the plaintiff's fraud claims. *Id.* at *1. *Dextours*, however, is an unpublished opinion.

8

2000). Second, courts are more willing to enforce a no-reliance clause if it expressly mentions and disclaims "reliance." *See Rissman*, 213 F.3d at 385; *Deluxe Media Servs. v. Direct Disc Network, Inc.*, No. 06 C 1666, 2007 WL 707544, at *6-8 (N.D. Ill. Mar. 2, 2007). Third, courts are more willing to enforce a no-reliance clause if the contracting parties are sophisticated. *Insitu, Inc. v. Kent*, No. CV-08-3067-EFS, 2009 WL 2160690, at *3-4 (E.D. Wash. July 17, 2009); *Tirapelli*, 813 N.E.2d at 1144; *Vigortone AG*, 316 F.3d at 645.

The no-reliance clause contained in the 2002 SAA is separate and independent from the merger clause. It expressly mentions reliance. Plaintiff and Defendant, together with their attorneys, are both sophisticated commercial parties. Every court that has addressed the issue would enforce the no-reliance clause under the circumstances presented here. The no-reliance clause is thus enforceable as a matter of law. Plaintiff cannot establish its fraud claims for alleged misstatements made outside of the terms of the 2002 SAA.

By its express terms, the no-reliance clause does not abrogate reliance on misstatements that are expressly included in the 2002 SAA. (2002 SAA § 16.10.) Two of the five alleged misrepresentations that form the basis of Plaintiff's fraud claims are embodied, at least to some extent, in the 2002 SAA.[3] Defendant's representation that it

---

[3]Plaintiff also argues that Defendant's alleged misrepresentation that it would use Plaintiff as its primary parts supplier through 2007 also appears in the 2002 SAA since Section 3.4 of the 2002 SAA made the intended scope of the agreement between the two parties certain commodity codes. (Dkt. No. 444, Pl.'s Resp. 24) However, the 2002 SAA says nothing of Defendant's intention to make Plaintiff its "primary parts supplier," only Defendant's intention to purchase certain enumerated items from Defendant. It would be a stretch for the Court to extend Defendant's explicit purchase obligations under the 2002 SAA to a promise by Defendant to make Plaintiff its "primary parts supplier."

9

would provide Plaintiff with a minimum of $5-6 million of new business in addition to the obligations under the contract each year appears at the bottom of Exhibit B-1 of the 2002 SAA.[4] (2002 SAA Ex. B-1.) Additionally, Defendant's representation that it will work in good faith with Plaintiff appears in Sections 10[5] and 11[6] of the 2002 SAA. (2002 SAA §§ 10, 11.) Therefore, though the no-reliance clause abrogates the reliance element of Plaintiff's fraud claims brought pursuant to alleged misstatements not expressly included in the 2002 SAA, it does not abrogate the reliance element of Plaintiff's fraud claims brought pursuant to the alleged misrepresentations contained in Sections 10 and 11 of the 2002 SAA and Exhibit B-1 of the 2002 SAA.

4. The Economic Loss Doctrine

Michigan has adopted the economic loss doctrine. *Neibarger v. Universal Coops., Inc.*, 486 N.W.2d 612 (Mich. 1992). The economic loss doctrine "bars tort recovery and limits remedies to those available under the Uniform Commercial Code where a claim for damages arises out of the commercial sale of goods and losses incurred are purely economic." *Id.* at 613. In a broad sense, the economic loss doctrine is intended to provide

---

[4] Exhibit B-1 of the 2002 SAA obligates Defendant to provide Whitesell with a "potential business growth opportunity between $5 to $6 million" each year to supplement Defendant's other purchase obligations under the 2002 SAA.

[5] Section 10 of the 2002 SAA requires the parties to "use good faith business efforts to work towards and [sic] acceptable arrangement" if compliance with the agreement for some reason caused economic hardship to one of the parties.

[6] Section 11 requires the parties to "use their best efforts to attempt to resolve any disputes" arising out of the agreement.

commercial contracting parties with the certainty that claims arising out of the contract will be governed exclusively by the UCC, and allow those parties to negotiate accordingly. *Id.* at 616; *see also Williams Elec. Co. Inc. v. Honeywell, Inc.*, 772 F. Supp. 1225, 1237 (N.D. Fla. 1991) ("There is a danger that tort remedies could simply engulf the contractual remedies and thereby undermine the reliability of commercial transactions.") As noted in *Neibarger*, the economic loss doctrine prevents contract law from "drown[ing] in a sea of tort law." *Neibarger*, 486 N.W.2d at 618 (*quoting East River Steamship Corp. v. Transamerica Delaval Inc.*, 476 U.S. 858, 866 (1986)). Under the economic loss doctrine, a plaintiff may not maintain a fraud claim for a defendant's failure to fulfill a promise that is "interwoven with the breach of contract." *Huron Tool & Eng'g Co. v. Precision Consulting Servs., Inc.*, 532 N.W.2d 541, 545 (Mich. App. 1995). In such a case, breach of contract is the plaintiff's only cause of action.

The parties dispute whether the economic loss doctrine bars fraud claims brought by sellers of goods as well as claims brought by purchasers of goods. Defendant relies on *Dinsmore Instrument Co. v. Bombarider, Inc.*, 999 F. Supp. 968 (E.D. Mich. 1998), which explicitly held that the economic loss doctrine applies to claims brought by sellers of goods. (Dkt. No. 596, Ex. A at 2-3.) Plaintiff relies on *Michigan Dessert Corp. v. Baldwin Richardson Foods, Inc.*, No. 06-15726, 2007 U.S. Dist. LEXIS 24305 (E.D. Mich. March 15, 2007) (unpublished opinion), which explicitly held that the economic loss doctrine does not apply to claims brought by sellers of goods. (Dkt. No. 593, Ex A at 3.) *Dinsmore* and

11

*Michigan Dessert* are both decisions of the United States District Court for the Eastern District of Michigan in which that court was asked to apply Michigan law. It is the duty of this Court to ascertain Michigan law by examining the decisions of Michigan state courts, and although *Dinsmore* and *Michigan Dessert* provide persuasive authority, the Court is not obligated to follow either decision. *See Allstate Ins. Co. v. Thrifty Rent-A-Car Systems, Inc.*, 249 F.3d 450, 454 (6th Cir. 2001).

Plaintiff also cites several decision by Michigan state courts that Plaintiff argues limit the application of the economic loss doctrine to claims brought by purchasers, such as *Neibarger*, *Huron Tool*, and *MASB-SEG Prop./Cas. Pool, Inc. v. Metalux*, 586 N.W.2d 549 (Mich. Ct. App. 1998). (Dkt. No. 593, Ex A at 3-4.) Although Plaintiff is correct to assert that these cases do apply the economic loss doctrine to claims brought by purchasers, the Court does not agree that these cases clearly exclude claims brought by sellers from the scope of the doctrine.

The Court relies on *General Motors Corp. v. Alumi-Bunk, Inc.*, 757 N.W.2d 859 (Mich. 2008), to hold that, under Michigan law, the economic loss doctrine bars fraud claims that are interwoven with a contract brought by sellers as well as buyers of goods. In *General Motors*, the plaintiff agreed to sell hundreds of Chevrolet Silverado trucks to the defendant. *Gen. Motors Corp. v. Alumi-Bunk, Inc.*, No. 270430, 2007 WL 2118796, at *1 (Mich. Ct. App. July 24, 2007), *rev'd*, 757 N.W.2d 859 (Mich. 2008). As part of the sale agreement, the defendant promised to "upfit," or modify, the vehicles before reselling them so not to

compete with the sale of non-modified vehicles by the plaintiff. *Id.* When the defendant failed to upfit the vehicles before reselling them, the plaintiff brought suit for breach of contract and fraud. Adopting the dissenting opinion of the Court of Appeals, the Michigan Supreme Court held that the economic loss doctrine barred the plaintiff's fraud claim. *Gen. Motors*, 757 N.W.2d at 859.

In all relevant respects, the factual background of *General Motors* is identical to that of the case at hand. In both cases, the allegedly fraudulent statement was a promise of future performance, it was interwoven with the contract of sale itself rather than "extraneous" to the contract, and it was made by the purchaser rather than the seller. Consistent with the holding in *General Motors*, the Court holds that the economic loss doctrine bars Plaintiff's claims for fraud based on Defendant's alleged misrepresentations that it would work in good faith with Plaintiff as provided in Sections 10 and 11 of the 2002 SAA, and that it would provide Plaintiff with a minimum of $5-6 million of new business in addition to the obligations under the contract each year as provided in Exhibit B-1 of the 2002 SAA. These promises are interwoven with the 2002 SAA, and Plaintiff is limited to the breach of contract remedies provided under the UCC for Defendant's alleged failure to honor them.

### III. Conclusion

Plaintiff's claims for fraud based on Defendant's alleged misrepresentations (1) that Defendant could not purchase the cold-headed and threaded fasteners listed on Exhibit B-2 from Plaintiff because Defendant was already contractually obligated to

13

purchase those parts from other suppliers; (2) that Defendant intended to transfer $75 million in revenue to Plaintiff by virtue of the 2002 SAA; and, (3) that Defendant intended to use Plaintiff as its primary supplier of fasteners through 2007, are barred by the no-reliance clause of the 2002 SAA. Plaintiff's claims for fraud based on Defendant's alleged misrepresentation (1) that Defendant would work in good faith with Plaintiff as provided in Sections 10 and 11 of the 2002 SAA; and (2) that Defendant would provide Plaintiff with a minimum of $5-6 million of new business in addition to the obligations under the contract each year as provided in Exhibit B-1 of the 2002 SAA are barred by the economic loss doctrine. Defendant is therefore entitled to summary judgment on all of Plaintiff's five claims for fraud.

An order consistent with this opinion will be entered.


Dated: October 5, 2009                             /s/ Robert Holmes Bell
                                                   ROBERT HOLMES BELL
                                                   UNITED STATES DISTRICT JUDGE