UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WHITESELL CORPORATION,

       Plaintiff,

v.

WHIRLPOOL CORPORATION,
WHIRLPOOL MEXICO S.A. de C.V.,
and JOSEPH SHARKEY,

       Defendants,

and

WHIRLPOOL CORPORATION,

       Counter-Plaintiff,

v.

WHITESELL CORPORATION,

       Counter-Defendant.
_____/

Case No. 1:05-CV-679

HON. ROBERT HOLMES BELL

## **OPINION**

This matter is before the Court on Defendant and Counter-Plaintiff Whirlpool Corporation's motion for partial summary judgment on Plaintiff and Counter-Defendant Whitesell Corporation's claim for lost profits (Dkt. No. 434). For the reasons that follow, Defendant's motion will be granted in part and denied in part.

## I. Factual Background

On March 15, 2002, the parties jointly executed a "Strategic Alliance Agreement" ("2002 SAA"). Generally, the 2002 SAA required Defendant to purchase all of its requirements for certain categories of "fasteners" (screws, nails, nuts, bolts, etc.) from Plaintiff over the term of the agreement. Specifically, Defendant's purchase obligations were governed by a complicated series of exhibits and contractual provisions.

Exhibit B of the 2002 SAA was the operative document identifying the items that Defendant was required to purchase from Plaintiff from year-to-year. It contained a listing of hundreds of part numbers, and provided that Defendant was required to purchase 100% of its requirements for each part number on the list from Plaintiff. The parties intended that Exhibit B contain every item classified as "Whirlpool Commodity Codes 497 (Threaded Fasteners) and 503 (Cold-Headed [Fasteners])" in existence at the execution of the agreement, with the exception of the items listed on Exhibits B-1 and B-2. (2002 SAA § 1.) Defendant retained the absolute discretion to assign a commodity code number to each part it used in appliance production. Exhibit B was to be updated each year of the contract term to reflect changes to Defendant's purchase obligations. An item that became obsolete during the previous year would be removed from Exhibit B, although Defendant was required to purchase a set number of residual obsolete items from Plaintiff. (2002 SAA § 3.2(D).) An item that Defendant created after the execution of the agreement that fell within Whirlpool Commodity Codes 497 and 503 would be added to Exhibit B, provided Plaintiff had

2

submitted the lowest competitive price quote for that item. (2002 SAA § 4.6.) Items could also be added to Exhibit B by separate agreement between the parties. (2002 SAA § 1.) Though each annually updated version of Exhibit B superseded the Exhibit B from the previous year, the parties expected that an item added to an Exhibit B during the course of a year would also appear on all subsequent yearly versions of Exhibit B for the remainder of the contract term.

Exhibit B-1 contained a list of items in existence at the execution of the agreement that Defendant was not required to purchase from Plaintiff over the term of the 2002 SAA. Even though Defendant explicitly reserved the right to purchase the Exhibit B-1 items from other suppliers, however, Defendant promised Plaintiff that the items listed on Exhibit B-1, combined with other items if necessary, would provide Plaintiff with a minimum "business growth opportunity" of $5 million. (2002 SAA Ex. B-1.) Some of the B-1 items were within "Whirlpool Commodity Codes 497 (Threaded Fasteners) and 503 (Cold-Headed [Fasteners])" and some were not.

Exhibit B-2 contained a list of thirteen items that Defendant would neither purchase exclusively from Plaintiff nor use to provide Plaintiff with any additional "business growth opportunity." Exhibit B-2 contained parts that were within "Whirlpool Commodity Codes 497 (Threaded Fasteners) and 503 (Cold-Headed [Fasteners])," but that, according to Defendant, Defendant could not purchase from Plaintiff because Defendant was already contractually obligated to purchase them from other suppliers.

The 2002 SAA was set to expire on December 31, 2007, provided that one of the parties issued a "notice of termination" at least six months prior to that date. The period between the issuance of the notice of termination and the expiration of the contract period was called the "phase-out period." (2002 SAA § 13.4.) During the phase-out period, Defendant was required to "use its best efforts to gradually decrease the quantity of items purchased from [Plaintiff]." (2002 SAA § 13.4.) Whirlpool issued a notice of termination on February 15, 2007.

Defendant admits that, throughout the course of the 2002 SAA, it purchased fasteners from suppliers other than Plaintiff. Defendant relies on certain unique characteristics of these fasteners and certain contractual provisions to argue that it did not breach the 2002 SAA by doing so.

## II. Law and Analysis

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. In evaluating a motion for summary judgment the Court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party. *Minges Creek, L.L.C. v. Royal Ins. Co. of Am.*, 442 F.3d 953, 955-56 (6th Cir. 2006) (citing *Matsushita*, 475 U.S. at 587). In order to defeat a summary judgment

motion, the nonmoving party "must show sufficient evidence to create a genuine issue of material fact." *Prebilich-Holland v. Gaylord Ent. Co.*, 297 F.3d 438, 442 (6th Cir. 2002) (citing *Klepper v. First Am. Bank*, 916 F.2d 337, 342 (6th Cir. 1990)). The nonmoving party must provide more than a scintilla of evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). In other words, the nonmoving party must present evidence sufficient to permit a reasonable jury to find in its favor. *Id.* Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

1. Thirty-Nine Parts Not Classified as Whirlpool Commodity Codes 497 and 503

Plaintiff claims lost profits for thirty-nine parts that were in existence at the execution of the agreement but were not classified within Whirlpool commodity codes 497 and 503 ("Defendant's Exhibit 10 Parts"). (Dkt. No. 434, Ex. 10.) Plaintiff argues that it is entitled to lost profits for these parts because, while the agreement was written to cover "Whirlpool Commodity Codes 497 (Threaded Fasteners) and 503 (Cold-Headed [Fasteners])," this language vests Plaintiff with supply rights for all cold-headed and threaded parts, and not merely for all the parts that fell within Whirlpool commodity codes 497 and 503. Plaintiff argues that it would not make sense to limit Defendant's purchase obligations to only those items falling within numerical Whirlpool commodity codes 497 and 503 because, under this interpretation, Whirlpool could completely control its purchase obligations since Whirlpool

5

retained the absolute power to assign a commodity code number to each part it used in appliance production. If Plaintiff's interpretation is correct, all cold-headed and threaded parts in existence at the execution of the agreement should have been on Exhibit B for 2002 (with the exception of the Exhibit B-1 and B-2 parts), and Defendant is liable for its failure to purchase these parts from Plaintiff.

However, even if the Court were to agree that the agreement extends to all cold-headed and threaded fasteners, to withstand Defendant's present motion Plaintiff must still present evidence that the Defendant's Exhibit 10 Parts actually were cold-headed or threaded fasteners. Fed. R. Civ. P. 56(e)(2); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Prebilich-Holland v. Gaylord Ent. Co.*, 297 F.3d 438, 442 (6th Cir. 2002). Defendant argues that "there is an issue of fact as to whether [the thirty-nine parts] were cold-headed/threaded." A jury, however, could not reasonably find that these parts are cold-headed and threaded parts without any evidence to support such a finding. *Anderson*, 477 U.S. at 252 ("[T]here must be evidence on which the jury could reasonably find for the plaintiff."); *Morales v. Am. Honda Motor Co., Inc.*, 71 F.3d 531, 535 (6th Cir. 1995) ("The burden on the moving party may be discharged if the moving party demonstrates that the nonmoving party has failed to establish an essential element of his or her case for which he or she bears the ultimate burden of proof at trial."). Plaintiff does not present any evidence that thirty-eight of the thirty-nine Defendant's Exhibit 10 Parts were cold-headed or threaded.

Plaintiff presents evidence that part number 62943 was cold-headed (Dkt. No. 469, 14-15),[1] but in addition to being a Defendant's Exhibit 10 Part, part 62943 was listed on Exhibit B-2 of the 2002 SAA. Plaintiff has acknowledged that it has no breach of contract claim for any of the parts listed on Exhibit B-2 (Dkt. No. 440, 8, 9, 13), and this Court has granted summary judgment in favor of Defendant on Plaintiff's fraud claim for the parts listed on Exhibit B-2. (Dkt. No. 602, Order.) For this reason, Defendant is entitled to summary judgment on Plaintiff's claims for lost profits for all of the Defendant's Exhibit 10 Parts.

2. Part Numbers 2196483 and 2196485

Plaintiff claims lost profits for parts 2196483 and 2196485 ("Parts 83 and 85"). Parts 83 and 85 were not cold-headed or threaded parts and were classified in Whirlpool commodity codes 691. Nevertheless, on April 16, 2003, Defendant afforded Plaintiff the supply rights to these parts, which in effect added them to Exhibit B for 2003.[2]

Defendant argues that Plaintiff is not entitled to lost profits for parts 83 and 85

---

[1] According to Plaintiff, Defendant purchased part number 62943 from Plaintiff at a time prior to the execution of the 2002 SAA when Plaintiff's production capabilities were limited to cold-headed and threaded parts. This evidence would be sufficient to create a genuine issue of material fact as to whether part 62943 was cold-headed.

[2] The process by which non-"497(Cold-Headed) and 503 (Threaded)" parts are added to Exhibit B is considerably more complicated than the Court's analysis suggests. After Defendant provides Plaintiff with a purchase order for such a part, Defendant undertakes a quality analysis of the part and subjects it to other tests. When Defendant is satisfied that a part meets specifications, Defendant "files a release" for the part. (2002 SAA § 1.) This is the point at which the part actually becomes part of Exhibit B. The Court assumes that, with respect to parts 83 and 85, these hurdles were satisfied because Defendant has acknowledged that it "offered [Plaintiff] the opportunity to supply both part numbers." (Dkt. No. 434, 15.) Further, Defendant has not argued that parts 83 and 85 never satisfied Defendant's inspection process, only that it was not obligated to purchase these parts because they were covered by a third-party patent.

7

because those parts were covered by a patent owned by a third party. Thus, according to Defendant, the contract between the parties for the sale of parts 83 and 85 was void for illegality. As evidence of this patent, Defendant relies on two e-mails. The first is an e-mail from Defendant to Plaintiff notifying Plaintiff that the items were covered by a third-party patent. (Dkt. No. 434, Def.'s Mot. Summ. J. Ex. 11.) The second is an e-mail from Defendant's in-house patent counsel to various Whirlpool employees concluding that the items were covered by a third-party patent. (Dkt. No. 493, Def.'s Rely Ex. 2.) Each e-mail contains an out-of-court statement being offered to prove the truth of the matter asserted in the e-mail, namely, that parts 83 and 85 are covered by a third-party patent, and thus each e-mail constitutes hearsay. Fed. R. Evid. 801(c).

Defendant claims that the report prepared by its in-house counsel is not hearsay because it tends to provide notice to Plaintiff that the parts were covered by a third-party patent. Though it is true that the report could provide notice to Plaintiff that the parts were covered by a third-party patent, the critical issue is whether the parts actually were covered by a third-party patent. If offered to prove this fact, the report does constitute hearsay. Defendant also argues that, even if the report constitutes hearsay, it falls within the hearsay exception for statements relating to the declarant's then existing state of mind. Fed. R. Evid. 803(3). To fall within this exception, the statement "must have been contemporaneous with the declarant's experience of the mental, emotional, or physical condition referred to when the declarant did not have 'an opportunity to reflect and possibly fabricate or misrepresent

8

his thoughts." *U.S. v. Mendez*, 303 F. App'x 323, 325-26 (6th Cir. 2008) (citing *United States v. LeMaster*, 54 F.3d 1224, 1231 (6th Cir. 1995)). Statements contained in the report prepared by Defendant's counsel are not of the "contemporaneous" nature that is required by the exception since during the preparation of the report Defendant would have had ample opportunity to fabricate or misrepresent its thoughts.

A court may not consider hearsay evidence in ruling on a motion for summary judgment. *Tinsley v. General Motors Corp.*, 227 F.3d 700, 703 (6th Cir. 2000). Defendant bears the burden of presenting evidence of a defense that it is asserting. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Because Defendant has not presented admissible evidence that items 83 and 85 were covered by a third party patent, it is not necessary for the Court to decide if Defendant was excused from its obligations to purchase these items from Plaintiff due to illegality. Defendant is not entitled to summary judgment on Plaintiff's claims for lost profits for parts 83 and 85.

3. Redesigned Parts

While the parties intended that Plaintiff assume the rights to supply all "497 (Threaded Fasteners) and 503 (Cold-Headed [Fasteners])" in existence at the execution of the agreement (with the exception of the parts in Exhibits B-1 and B-2), Plaintiff's rights to supply items created by Defendant *after the execution of the agreement* ("newly created items") were not so absolute. Under Section 4.6 of the 2002 SAA, Plaintiff was entitled to supply Defendant with a newly created item under two limited circumstances: (1) if the newly created item was

9

classified as Whirlpool commodity codes 497 or 503 and Plaintiff offered Defendant "the best total costs . . . as compared to all other quoted suppliers" for that item; or (2) if Defendant discontinued an item that Plaintiff was supplying to Defendant and replaced it with a newly created item in order to "circumvent the agreement and move items to another supplier." (2002 SAA § 4.6.) If neither of these two circumstances was present, Plaintiff was not entitled to supply a newly created item to Defendant.

Plaintiff claims lost profits for several newly created items. Plaintiff's claim for lost profits for newly created items suggests that Plaintiff believes, for each newly created item for which Plaintiff claims lost profits, either or both of the two circumstances identified above is present. Plaintiff, however, has not identified, nor is Plaintiff presently required to identify, whether it believes it is entitled to lost profits for newly created items pursuant to circumstance (1) or (2) above. *See, e.g.*, Fed. R. Civ. P. 8(a)(2) (requiring that a prayer for relief consist of only a short statement of the claim).

Defendant has moved for summary judgment on those of Plaintiff's claims for lost profits for newly created items brought pursuant to circumstance (2) above. Plaintiff thus must present evidence that Defendant discontinued an item that Plaintiff was supplying to Defendant and replaced it with a newly created item in order to "circumvent the agreement." Plaintiff argues generally that several of the of the newly created parts were only superficially different, if at all different, than the obsolete parts that they replaced, suggesting the only conceivable purpose for the change was to "circumvent the agreement." Plaintiff's argument

is convincing, but Plaintiff must still present evidence that the newly created parts for which it claims lost profits were only superficially different, if at all different, than the obsolete parts that they replaced. *See* Fed. R. Civ. P. 56(e)(2); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Prebilich-Holland v. Gaylord Ent. Co.*, 297 F.3d 438, 442 (6th Cir. 2002); *Morales v. Am. Honda Motor Co., Inc.*, 71 F.3d 531, 535 (6th Cir. 1995).

Plaintiff argues that one newly created part, part number 3400231, was only superficially different than the obsolete part it was created to replace, part number 828519. Plaintiff presents deposition testimony that, to create 3400231, Defendant changed the length of 828519 and added an epoxy "patch" or coating. (Dkt. No. 469, at 24 (referring to Ex. 13).) Defendant relies on this testimony to argue that, because these changes did not result in a new application for the part, the only conceivable purpose for the redesign was to "circumvent the agreement." However, the deposition testimony relied on by Defendant goes on to explain that a patch can "help lock [a screw] in there tighter" and that the changes improved both the quality and performance of the part. (Dkt. No. 469, Ex. 13 at p. 467.) The Court thus holds that no reasonable jury could find that Defendant redesigned part number 828519 "to circumvent the agreement." *Neimi v. NHK Spring Co., Ltd.*, 543 F.3d 294, 298 (6th Cir. 2008) ("A dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party."). The changes were instead intended to improve the performance and quality of the part.

Plaintiff does not present evidence that any other newly created parts for which it

claims lost profits were only superficially different, if at all different, than the obsolete parts they replaced, nor does Plaintiff present any other evidence that Defendant redesigned parts "to circumvent the agreement." For this reason, Defendant is entitled to summary judgment on all of Plaintiff's claims for lost profits for newly created parts brought on the theory that Defendant discontinued an item that Plaintiff was supplying to Defendant and replaced it with a newly created item in order to "circumvent the agreement" (circumstance (2) above). The Court notes, however, that this holding does not preclude Plaintiff from seeking lost profits for newly created parts on the theory that the newly created part was classified as Whirlpool commodity codes 497 or 503 and Plaintiff offered Defendant "the best total costs . . . as compared to all other quoted suppliers" for that item (circumstance (1) above). For example, Plaintiff may still be entitled to lost profits for part number 3400231 if Plaintiff can establish that part number 3400231 fell within Whirlpool commodity codes 497 or 503 and that Plaintiff submitted the lowest price quote for that part.

4. Safety Stock

Throughout the course of the 2002 SAA, Defendant purchased items, including Exhibit B items, from suppliers other than Plaintiff that it held in inventory rather than used in active production lines to protect itself against "a potential strike situation, a potential weather situation," or "a supplier transition." (Dkt. No. 434, 18.) Defendant called these items its "safety stock." Defendant argues that it was entitled to purchase safety stock from suppliers other than Plaintiff because one purpose of amassing safety stock is to protect a

12

buyer from uncooperative behavior by a supplier. (Dkt. No. 434, 19-20.) Defendant has therefore moved for summary judgment on Plaintiff's claims for lost profits for safety stock.

Plaintiff resists Defendant's motion by directing the Court's attention to the language in Exhibit B requiring that Defendant purchase 100% of its requirements for the items listed on Exhibit B from Plaintiff over the course of the 2002 SAA. (2002 SAA Ex. B.) Plaintiff notes that the 100% requirement does not contain an exception for safety stock.

Whether the 100% purchase requirement applied only to Defendant's requirements for parts used in active production lines, or whether it extended to all parts purchased by Defendant including safety stock, is an ambiguous question of contract interpretation that should be left to the jury. *Michaels v. Amway Corp.*, 522 N.W.2d 703, 706 (Mich. Ct. App. 1994) ("When deciding a motion for summary disposition in a claim for breach of contract, a court may interpret the contract only where the terms are clear. If the terms are ambiguous, a factual development is necessary to determine the intent of the parties, and summary disposition is inappropriate.") Plaintiff presents sufficient evidence in support of its respective interpretation to withstand Defendant's present motion. Summary judgment in favor of Defendant on Plaintiff's claim for lost profits for safety stock is not appropriate.

5. Service Parts

Plaintiff seeks lost profits for Exhibit B items that Defendant's LaPorte division purchased from other suppliers. Defendant's LaPorte division was responsible for purchasing parts used by Defendant in appliance maintenance and repair rather than in actual

production lines. Defendant argues that it was entitled to purchase these parts from suppliers other than Plaintiff because of a provision in Section 1 of the 2002 SAA stating that "[t]he Whirlpool manufacturing divisions that are subject to this Agreement are listed on Exhibit C." Defendant's LaPorte Division is not listed on Exhibit C.

Plaintiff resists Defendant's present motion only by arguing that the 2002 SAA required Defendant to purchase 100% of its requirements for Exhibit B items from Plaintiff. In its Response Plaintiff does not address the provision in the 2002 SAA relied on by Defendant that qualifies the 100% purchase requirement by excluding certain Whirlpool facilities from the agreement. However, Plaintiff's arguments contained in its Response to Defendant's motion for summary judgment on the "Benton Harbor" and "Exhibit B-2" parts (Dkt. No. 440), are applicable to Defendant's present motion as well. In that Response, Plaintiff argues that, although language in Section 1 of the 2002 SAA limits the applicability of the agreement to the "manufacturing divisions" listed on Exhibit C, the agreement does not address whether Whirlpool facilities that are not considered manufacturing divisions are subject to the 2002 SAA. Though the parties' failure to include a provision addressing the applicability of the agreement to non-manufacturing facilities could suggest that those facilities are not subject to the 2002 SAA, Plaintiff directs the Court's attention to language at the top of the 2002 Exhibit B, which suggests that the agreement is intended to apply to all North American divisions, and not just manufacturing divisions. (2002 SAA Ex. B.) However, to withstand Defendant's present motion, Plaintiff must also present evidence that

14

the LaPorte division is not, in fact, a manufacturing division. Plaintiff presents no such evidence.[3] Thus, Defendant is entitled to summary judgment on Plaintiff's claim for lost profits for service parts, to the extent those service parts were purchased by Defendant's LaPorte division.

6. Trial Parts

Plaintiff seeks lost profits for items identical to Exhibit B items that Defendant purchased from suppliers other than Plaintiff for use in trial production runs rather than in active production lines. Defendant has moved for summary judgment on this claim, arguing that it was permitted to purchase items identical to Exhibit B items from suppliers other than Plaintiff for use in trial production runs pursuant to Section 4.9 of the 2002 SAA. Section 4.9 of the 2002 SAA allows Defendant to "test and have trial production runs of appliance products using Comparable Items purchased from other suppliers." Plaintiff resists Defendant's motion by arguing that, under Section 4.9 of the 2002 SAA, Defendant was permitted to purchase parts similar to those listed on Exhibit B from other suppliers for use in trial runs, but Defendant was not permitted to purchase parts identical to those listed on Exhibit B from other suppliers.

---

[3]The Court addressed a similar issue in its opinion on Defendant's motion for partial summary judgment on Plaintiff's claims for parts excluded from the parties' 2002 Strategic Alliance Agreement. (Dkt. No. 613.) In that opinion, the Court denied summary judgment in favor of Defendant, in part because it determined that non-manufacturing divisions could be subject to the agreement *and* because Plaintiff had presented sufficient evidence that the Benton Harbor division was not a manufacturing division. Conversely, in this case, although the Court still acknowledges that non-manufacturing divisions could be subject to the agreement, Plaintiff has not presented any evidence that the LaPorte Division was not a manufacturing division, and so summary judgment in favor of Defendant is appropriate.

15

Plaintiff presents sufficient evidence to withstand Defendant's present motion. The 2002 SAA defines a "Comparable Item" as "a model of Goods of comparable kind, quality and performance characteristics." (2002 SAA § 4.8.) This language can reasonably be interpreted to exclude those items that are, in all respects, identical to those items listed on Exhibit B, and where a contract admits of multiple reasonable interpretations, summary judgment is not appropriate. *See Michaels v. Amway Corp.*, 522 N.W.2d 703, 706 (Mich. Ct. App. 1994). Further, if, as it appears to be, Section 4.9 is intended to allow Defendant to conduct trial runs using a vast array of similar parts and gather and compare information relating to the performance capabilities of those parts, there is no logical reason for Section 4.9 to permit Defendant to purchase parts identical to Exhibit B parts from other suppliers because there is nothing to prevent Defendant from testing and comparing those parts after purchasing them from Plaintiff.

For these reasons, summary judgment in favor of Defendant on Plaintiff's claim for lost profits for trial parts identical to those in Exhibit B is not appropriate. The Court notes, however, that it is only denying Defendant's motion for summary judgment on Plaintiff's claim for lost profits for parts purchased from other suppliers and used in trial runs that are *identical* to Exhibit B parts. To the extent Plaintiff's claim for lost profits for trial parts includes parts not identical, but merely similar, to Exhibit B parts, summary judgment in favor of Defendant is appropriate pursuant to Section 4.9 of the 2002 SAA.[4]

---

[4] It is not clear to the Court whether Plaintiff's claim for lost profits includes trial parts similar, but not identical, to Exhibit B items.

## 7. The Phase-Out Period

Plaintiff claims lost profits for Defendant's failure to purchase Exhibit B parts from Plaintiff after Defendant issued its termination notice on February 15, 2007. Defendant has moved for summary judgment on this claim. The parties agree that, during the phase-out period, Defendant was required to "use its best efforts to gradually decrease the quantity of Items purchased from [Plaintiff]." (2002 SAA at § 13.4.) According to Defendant, "best efforts" in this context means that Defendant had no obligation to purchase parts from Plaintiff following the notice of termination. Plaintiff argues that "best efforts" in this context required Defendant to continue to purchase much, if not all, of its requirements for 2002 SAA Items from Plaintiff following the notice of termination.

Neither party offers any factual support for its interpretation of what "best efforts" required in this context. However, whether Defendant exercised best efforts during the phase out period is a question concerning Defendant's state of mind during this period, and questions concerning a party's state of mind should generally not be resolved at the summary judgment stage. *See Pemberton v. Dharmani*, 525 N.W.2d 497, 501 n.1 (Mich. App. 1994) ("The existence of good faith is normally a question of fact for the jury that should not be resolved by summary disposition unless the evidence is undisputed or conclusive."). There are questions of fact as to what the "best efforts" standard required in this context and whether Defendant complied with it. Summary judgment in favor of Defendant for Plaintiff's claim for lost profits during the phase out period is not appropriate.

### 8. Punitive Damages

Plaintiff asserts a claim for punitive damages. Defendant has moved for summary judgment on this claim. As discussed in the Court's opinion on Defendant's motion for summary judgment on Plaintiff's claim for fraud (Dkt. No. 601), Michigan law applies to Plaintiff's claims for both fraud and breach of contract. Michigan law does not permit a plaintiff to recover punitive damages in an action for breach of a commercial contract. *Kewin v. Mass. Mut. Life Ins. Co.*, 295 N.W.2d 50, 55 (Mich. 1980). Further, the Court need not address whether Plaintiff is entitled to punitive damages for its claims for fraud because the Court has granted summary judgment in favor of Defendant on all five of Plaintiff's claims for fraud. (Dkt. No. 602.)

### III. Conclusion

Plaintiff presents no evidence that thirty-eight of the thirty-nine Defendant's Exhibit 10 Parts are cold-headed or threaded fasteners, and so Defendant is entitled to summary judgment on Plaintiff's claim for lost profits for these parts. Defendant is also entitled to summary judgment on Plaintiff's claim for lost profits for part 62943 because Plaintiff has not asserted a breach of contract claim for this part and Plaintiff's fraud claim is barred by the no-reliance clause of the 2002 SAA. Defendant is not entitled to summary judgment on Plaintiff's claim for lost profits for parts 83 and 85 because Defendant has not presented admissible evidence that these parts were covered by a third-party patent. Defendant is entitled to summary judgment on Plaintiff's claim for lost profits for all newly created parts

brought pursuant to a theory that Defendant created those parts to replace Exhibit B parts and "to circumvent the agreement." Plaintiff has not presented sufficient evidence to support this claim. However, Plaintiff may still maintain a claim for lost profits for newly created parts on a theory that the newly created parts were within Whirlpool Commodity Codes 497 and 503, and Plaintiff submitted the lowest price quote for those parts. Defendant is entitled to summary judgment on Plaintiff's claim for lost profits for service parts, to the extent those service parts were purchased from Defendant's LaPorte division, because Plaintiff has failed to introduce evidence that Defendant's LaPorte division was not a manufacturing division. Defendant is not entitled to summary judgment on Plaintiff's claim for lost profits for trial parts that are identical to Exhibit B parts, because a fact finder could determine that Section 4.9 of the agreement did not permit Defendant to purchase these parts from other suppliers. Defendant is not entitled to summary judgment on Plaintiff's claims for lost profits during the phase-out period, because there are questions of fact as to what the "best efforts" standard required and whether Defendant complied with it. Finally, Defendant is entitled to summary judgment on Plaintiff's claim for punitive damages because Michigan law does not permit punitive damages for breach of a commercial contract and the Court has granted summary judgment in favor of Defendant on Plaintiff's fraud claims.

An order consistent with this opinion will be entered.

Dated: October 13, 2009               /s/ Robert Holmes Bell
                                      ROBERT HOLMES BELL
                                      UNITED STATES DISTRICT JUDGE